**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

10X GENOMICS, INC. and
THE BOARD OF TRUSTEES OF THE
LELAND STANFORD JUNIOR
UNIVERSITY,

                Plaintiffs,

     v.

PARSE BIOSCIENCES, INC.,

                Defendant.

CIVIL ACTION
NO. 22-1117

## OPINION

**Slomsky, J.**                                                        **February 21, 2025**

### TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................................................................ 3

II.   **BACKGOUND** .................................................................................................... 3

   A.   Defendant's Daubert Motion to Preclude Expert Testimony ........................................... 3

   B.   Plaintiffs' Opposition to Defendant's Daubert Motion .................................................... 6

III.  **STANDARD OF REVIEW** ...................................................................................... 7

   A.   Qualification ...................................................................................................................... 8

   B.   Reliability .......................................................................................................................... 8

   C.   Fit ................................................................................................................................... 10

IV.  **ANALYSIS** ......................................................................................................... 10

A.    Lost Profits ......................................................................................................11

B.    Price Erosion ................................................................................................ 16

C.    Reasonable Royalties ................................................................................... 19

    i.    Brenner Patents' Royalty Calculation ...................................................... 21

    ii.    Giresi Patents' Royalty Calculation .......................................................... 23

**V.    CONCLUSION** ................................................................................................ 24

## I.    INTRODUCTION

Before the Court is Defendant Parse Biosciences, Inc.'s ("Parse" or "Defendant") <u>Daubert</u> Motion to Exclude Expert Testimony.  (Doc. No. 259, 260.)  Defendant contends that the testimony and expert report on damages of Julie Davis, an expert retained by Plaintiffs 10x Genomics, Inc. ("10x") and the Board of Trustees of Leland Stanford Junior University ("Stanford University") (collectively "Plaintiffs"), should be excluded at trial because her calculations of Plaintiffs' lost profits, price erosion and reasonable royalties for the alleged infringement of Plaintiffs' Brenner and Giresi patents are unreliable.  (<u>Id.</u> at 18.)  Plaintiffs submit in response that Davis used reliable methodologies in calculating their damages.  (Doc. No. 271 at 21.)

For the reasons set forth below, Defendant's <u>Daubert</u> Motion to Exclude Expert Testimony (Doc. Nos. 259, 260) will be denied.

## II.    BACKGOUND[1]

### A.    Defendant's <u>Daubert</u> Motion to Preclude Expert Testimony

On September 13, 2024, Defendant filed a <u>Daubert</u> Motion to preclude Plaintiffs' damages expert, Julie Davis, from testifying at trial.  (Doc. No. 260 at 24.)  Defendant contends that Davis committed multiple errors in her opening expert report which led to an overestimation of $6 million in her damage calculation.  (<u>Id.</u>)  Defendant further contends that her reports, including her second and supplemental report, in which she made changes after reviewing shortcomings in her first report as noted by Defendant's expert, Dr. Ivan Hofmann, are unreliable because they are based on flawed methodology in estimating Plaintiffs' alleged damages.

---

[1]    A comprehensive description of Plaintiffs' Brenner and Giresi patents can be found in the Court's Opinion Denying Defendant's Motion for Summary Judgment.  (Doc. No. 312.)

More specifically, Defendant first claims that Julie Davis's calculation regarding lost profits is unreliable because it is based on faulty information.  (Doc. No. 260 at 29.)  It asserts that she incorrectly relies on a 2023 third-party report by DeciBio which states that 10x occupied 75% of the market for single cell analysis products.[2]  (Id. at 30.)  It maintains that 10x's lost profits for the infringing patents in this case cover from 2023 to 2024, whereas the report is based only on data from 2020 through 2022.  Therefore, Davis incorrectly adopts the 75% estimate.  (Id.)  Further, 10x's Federal Rule of Civil Procedure 30(b)(6) witness, Dr. Jens Durruthy Durruthy, 10x's Director of Product Management, testified at his deposition that third-party reports on the single-cell related markets are unreliable and that the 70-80% estimate stated in the DeciBio third-party report is unreliable.[3]  (Id.)  Defendant also contends that Davis's estimation of lost profits relies only on discussions with Dr. Durruthy, who is not an expert witness in this case, and that Davis has no other underlying data or evidence to support her calculations.  (Id. at 31-34.)

Second, Defendant argues that Davis's report is also flawed regarding her price erosion analysis.  (Id. at 35.)  Specifically, she calculates a 50% price erosion of 10x's products after concluding that half of Defendant's customers would have purchased 10x products as a substitute for its allegedly infringing product.  (Id. at 36.)  But Defendant argues that Davis relies on the same unreliable third-party report, the DeciBio report, to determine 10x's market share.  (Id.)  It also claims that the report does not support her final calculation.  She first found that, based on the DeciBio report and testimony from Defendant's witnesses, Defendant's estimated market share is

---

[2]    According to its website, DeciBio is a strategy consulting and market intelligence firm serving clients across the precision medicine ecosystem.  The relevant report can be found here: https://www.decibio.com/insights/10x-genomics-single-cell-dominance-is-it-sustainable.

[3]    Federal Rule of Civil Procedure 30(b)(6) allow depositions of organizations through designated officers, directors, or managing agents who consent to testify on the organizations' behalf.  See Fed. R. Civ. P. 30(b)(6).  "The persons designated must testify about information known or reasonably available to the organization."  Id.

30% to 40%, but she later increases that percentage by concluding that a reasonable estimate would be "at least half of the price erosion related to 10x's inability to increase pricing due to Parse." (Id. (quoting Doc. No. 262-14 at 17:14-21 (Ex. X)).)

Defendant also challenges Davis's conclusion that 10x suffered price erosion from discounts and giveaways it gave to customers in order to "starve off competition from Parse." (Id. at 37.) It maintains that 10x has had a "practice of providing free instruments to customers prior to 2021 — before Parse launched any products." (Id.) Thus, for this reason and others, Defendant could not have been responsible for price erosion in Davis's calculations in view of all 10x's discounts and giveaways.

Lastly, Defendant contests Davis's calculation of reasonable royalties for the Brenner and Giresi patents. (Id. at 38.) Regarding the Brenner patents, Defendant argues that Davis calculates the royalties based on a license agreement between 10x and REquest Genomics, LLC which agreed to pay a 12% royalty on net sales of products utilizing the Giresi Patents, not the Brenner patents. (Id. (emphasis added).) Defendant contends that she ignores the license agreement between 10x and Population Genetics Technologies Ltd., which was the only purchase and license agreement related to the Brenner patents. (Id. at 39.)

Regarding the Giresi patents, Davis calculates an $800,000 lump-sum payment based upon a license agreement between Stanford and Epinomics, which requires 10x to pay a royalty plus an annual maintenance fee for the Giresi patents.[4] (Id.) Based on that license, Davis calculates that Defendant owes $200,000 for 2021 usage, $300,000 for 2022 usage, and $300,000 for 2023 usage, totaling $800,000. (Id.) However, Defendant argues that Davis's reliance on the Stanford agreement for the Giresi patents is inconsistent with her analysis of the Brenner Patents. (Id. at

_____

[4] Epinomics was later acquired by 10x. (Doc. No. 260 at 39.)

39-40.)  Specifically, Davis found that, as it relates to the Brenner patents, the Stanford agreement was not comparable for that hypothetical negotiation because the license was between an academic institution and a commercial partner, but then used the Stanford agreement as the comparable agreement for the Giresi patents.  (Id. at 39-40.)

### B.    Plaintiffs' Opposition to Defendant's <u>Daubert</u> Motion

In Plaintiffs' Opposition to Defendant's <u>Daubert</u> Motion, they argue that Defendant's disagreement with Davis's report does not go to its methodology or reliability but rather goes to its weight and credibility.  (Doc. No. 271 at 32.)  Specifically, regarding lost profits, Plaintiffs maintain that it is appropriate for Davis to rely upon the DeciBio third-party report to determine market share.  (Id.)  The 75% estimate was consistent with 10x's data and Defendant's employees' testimony.  (Id.)  They further maintain that it was proper for Davis to rely on 10x's witnesses like Dr. Jens Durruthy Durruthy, its Director of Product Management, and Dr. John Quackenbush, 10x's technical expert, in formulating her report because an expert witness can rely upon information from other fact and expert witnesses when developing an opinion.  (Id. at 34, 40-41.)

Next, as to price erosion, Plaintiffs argue that Davis's calculation that Defendant was 50% responsible for 10x's price reduction and discounts is a factual dispute between experts that should be left for a jury to decide.  (Id. at 36.)  They point to Davis's report in which she concludes that "Parse (unlike other competitors) targets 10x customers with its cheaper products, and Parse's impact on 10x sales is 'in the range of 60% to 83%.'"  (Id. at 37 (quoting 262-14 at 44 (Ex. N)).)

Lastly, regarding reasonable royalties, Plaintiffs maintain that comparability of licenses is another factual dispute, and Defendant's disagreement as to how Davis calculates royalties for the Giresi and Brenner patents do not render her findings unreliable.  (Id. at 38.)  Also, they submit that Davis's analysis of the patents in regard to royalties is consistent because "she looked to the particular circumstances of the independent and separate hypothetical negotiations for the Brenner

6

Patents and the Giresi Patents to assess reasonable royalty damages for each." (Id. at 38-39.) And regarding license maintenance fees for the Giresi patents, both Plaintiffs' and Defendant's damages experts agree that a maintenance fee is applicable to the research and marketing for Defendant's ATAC-seq product, but disagree on the proper amounts and pertinent years. (Id. at 39.) Again, Plaintiffs argue that Defendant's challenge goes to the weight and credibility of expert, Julie Davis, not to the exclusion of her testimony. (Id. at 39-40.)

## III.    STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. See FED. R. EVID. 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Id.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the United States Supreme Court provided the analytical framework to determine the admissibility of expert testimony under Federal Rule of Evidence 702. 509 U.S. 579 (1993). Daubert held that Rule 702 imposes a "gatekeeping" obligation on the trial court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 598. Also under Rule 702, the United States Court of Appeals for the Third Circuit has held that it "has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about

matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). These requirements are also referred to as "qualification, reliability and fit." Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

### A.    Qualification

The Third Circuit has "interpreted Rule 702's qualification requirement liberally." Pineda, 520 F.3d at 244 (citing Schneider, 320 F.3d at 404; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994)). Accordingly, a "broad range of knowledge, skills, and training qualify an expert." Paoli, 35 F.3d at 741. Because both the "substantive" and "formal" qualifications of an expert are viewed liberally, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." Id. Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have specialization that the court considers most appropriate." Pineda, 520 F.3d at 244 (quoting Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)).

### B.    Reliability

Turning to the "reliability" requirement, the Third Circuit has interpreted reliability "to mean that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Pineda, 520 F.3d at 244 (internal quotations omitted) (quoting Paoli, 35 F.3d at 742). Notably, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." Id. at 744. Admissibility turns "on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined." Kannankeril v. Terminix Intern., Inc., 128 F.3d 802, 806 (3d Cir. 1997). In assessing the reliability of scientific expert testimony, a court should consider the following:

> (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

FED. R. EVID. 702 advisory committee's note.

It is well established, however, that these factors "are neither exhaustive nor applicable in every case." Kannankeril v. Terminix Int'l., Inc., 128 F.3d 802, 806-07 (3d Cir. 1997). The Daubert Court "made clear that its list of factors was meant to be helpful, not definitive." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151 (1999). Indeed, when examining expert testimony that is based on practical experience, rather than academic theories, "the Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable" because the reliability of testimony from a practical experience expert "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." States v. Fernwood Hotel and Resort, No. 12-906, 2014 WL 198568, at *3 (M.D. Pa. Jan. 15, 2014) (quoting United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000)).

Furthermore, the Daubert standard of admissibility does not apply only to "scientific" expert testimony. In Kumho Tire Co., Ltd., the Supreme Court of the United States held that "Daubert's general holding . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge. 526 U.S. at 141. Thus, the test of reliability is "flexible, and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Id. (quoting Daubert, 509 U.S. at 594–95). Whether a Daubert hearing is necessary is within the sound discretion of the district court. Sec'y

United States Dep't of Lab. v. Nursing Home Care Mgmt. Inc., No. 23-2284, 2025 WL 351599, at *9 (3d Cir. Jan. 31, 2025).

### C.      Fit

To satisfy the "fit" requirement, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404.  For expert testimony to meet the Daubert "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702.  "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (internal quotations omitted) (citing United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)).

Under Daubert, the district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93.  And the Third Circuit has found that "courts are loath to outright dismiss an expert.  Though the burden is on the proponent, we have said Rule 702 . . . has a liberal policy of admissibility." Nursing Home Care Mgmt. Inc., 2025 WL 351599, at *8.

### IV.      ANALYSIS

As a preliminary matter, the Court will not hold a Daubert hearing on the Motion to Preclude the Expert Testimony of Julie Davis.  The decision "to hold [a Daubert hearing] rests in the sound discretion of the district court" and, as noted by the Third Circuit, a Daubert hearing is not always required.  Padillas v. Stork–Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999); Nursing Home Care Mgmt. Inc., 2025 WL 351599, at *9.  Here, there is a full record before the Court on the admissibility of her testimony, including her expert reports and deposition.  Under Third Circuit

precedent, nothing more is required for a court to determine the admissibility of an expert witness.[5]  See Oddi v. Ford Motor Co., 234 F.3d 136, 154 (3d Cir. 2000) (upholding a district court's decision to deny a Daubert hearing where the court "already had before it the depositions and affidavits of the plaintiff's experts.")

Next, Defendant argues that Davis's expert opinion on damages, including Plaintiffs alleged lost profits, price erosion and reasonable royalties for the Brenner and Giresi patents is unreliable.[6]  (Doc. No. 260 at 18.)  Each argument will be discussed seriatim.

A.    Lost Profits

As noted earlier, Defendant contends that Julie Davis's lost profits calculation is unreliable for several reasons.  First, Defendant argues that she uses a market share analysis report prepared in 2023 by a third-party, DeciBio, which states that 10x products occupied approximately 75% of the single-cell analysis market share from 2020 through 2022. (Doc. No. 260 at 30.)  Defendant maintains that the use of this report renders her opinion on lost profits unreliable because:  (1) Plaintiffs argue they lost profits in 2023 and 2024, and the report only refers to data from 2020 to 2022; (2) Plaintiffs' 30(b)(6) witness, Dr. Jens Durruthy, Director of Product Management, agreed that the 70-80% figure in the DeciBio report was unreliable; and (3) there were other competing products in the marketplace during this time, not just Defendant's alleged infringing products.  (Id. at 30-31.)

---

[5]    In this regard, neither party requested an evidentiary hearing on the Daubert Motion, only a hearing.  Argument on the Daubert Motion was held on the record at the Final Pre-Trial Conference on February 19, 2025.  At the hearing, neither party mentioned the need for an evidentiary hearing on the Daubert Motion.

[6]    Julie Davis's qualifications as an expert on damages in a patent infringement case is not challenged by Defendant.  The relevancy or fit of her testimony also is not in question.  Defendant's only opposition to Davis's testimony goes to the reliability of her methodology.

Defendant further argues that Davis used the 75% figure to calculate what Defendant's customers would have purchased had their allegedly infringing product not been available.  (Id.) This analysis is broken down into thirds, with Davis opining that one-third of Defendant's customers would have purchased a 10x instrument, and the other two-thirds, known as the "Halo Customers," would have purchased reagents and borrowed instruments from 10x.[7]  (Id.)  Based on this finding, Davis opined that 100% of the Halo Customers would have purchased 10x consumables and 36% of the other one-third of purchasers would have purchased a 10x instrument. (Id.)  Defendant claims that these calculations were based on discussions with Dr. Durruthy, Plaintiffs' 30(b)(6) witness, and the DeciBio report, without further information provided as to how he arrived at these results.  (Id. at 31-32.)

To be entitled to lost profits, a plaintiff must show that "but for" the infringement, the plaintiff would have made the sales obtained by the defendant.  Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1349 (Fed. Cir. 1999).  Although there is no restrictive method to proving lost profits, the Federal Circuit recognizes the Panduit factors to show a "but for" causation, requiring the plaintiff to show:  "(1) 'demand for the patented product'; (2) 'absence of acceptable noninfringing substitutes'; (3) 'manufacturing and marketing capability to exploit the demand'; and (4) 'the amount of profit that . . . would have [been] made.'"  Georgetown Rail Equip. Co. v. Holland L.P., 867 F.3d 1229, 1240-41 (Fed. Cir. 2017) (quoting Panduit Corp. v. Stahlin Brothers Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978)).

---

[7]  A reagent is defined as "[a] substance used to carry out a laboratory test.  Reagants may be used in a chemical reaction to detect, measure, or make other substances. https://www.cancer.gov/publications/dictionaries/cancer-terms/def/reagent.

As to the first factor, demand for the patent product, Davis opines that based upon Defendant's accused product sales from 2021 to 2024, testimony of Defendant's employees and Chief Executive Order ("CEO"), Alexander Rosenberg, who stated that Defendant had increasing revenues from 2024 to 2025, and a review of 10x's Chromium products from 2015 to 2025, there was a high demand for single cell products.  (Id. at 25-27.)  Her findings in this regard also refer to the DeciBio report which states that the single cell market was "fast growing and increasingly more established."  (Id. at 26-27.)

Regarding the second Panduit factor, absence of acceptable non-infringing substitutes, Davis refers to Dr. Quackenbush's findings that "scientists seeking to perform [single cell analysis] for a study would have considered the use of [10x's] Chromium [product] in the absence of [Defendant's infringing product.]"  (Id. at 29.)  Davis also notes that although there were other competing products that could have been considered acceptable substitutes, Defendant was ultimately 10x's primary competitor.[8]  (Id. at 29-30.)

Next, as to the third Panduit factor, manufacturing and marketing capability to exploit demand, Davis opines that 10x has an extensive technological and operational infrastructure.  (Id. at 24.)  Specifically, 10x had a new 150,000-square-foot facility opening in Pleasanton, California, in March 2023.  (Id. at 35.)  Additionally, its Singapore facility had the ability to "grow at least 4x in its current footprint."  (Id. at 35.)  She also relies on Dr. Durruthy's explanation that 10x had the ability to increase the manufacturing and supply of its Chromium products within three (3) weeks. (Id.)  Taking these factors together, Davis concludes that "10x had sufficient manufacturing and

---

[8]   Specifically, Davis identifies the following competitive products that were also in the market in 2022:  Bio-Rad's ddSEQ, Fluidigm C1, Becton Dickinson Rhapsody, Mission Bio Tapestri Platform, Scale Single Cell RNA Sequencing Kit, Singleron SCOPE Chip Products, and Fluent PIPseq product.  (Doc. No. 262-14 at 29.)

marketing resources to fulfill the demand for past sales lost to Parse while meeting the ongoing demand for Chromium products." (Id.)

Lastly, regarding the fourth factor, amount of profit that the patentee would have made absent infringement, Davis calculates lost profits based upon Defendant's sales in the United States from January 2023 to March 2024, when Defendant's sales data was available. (Id. at 36, 40.) In her first report, she calculates 10x's lost revenue, including for both instrument customers and Halo Customers as $14,854,628. (Id.) In her supplemental report dated July 12, 2024, which was prepared in response to the expert report of Dr. Ivan Hofmann, Defendant's damages expert, Davis reduces her calculations on lost profits to $12,499,748. (Doc. No. 262-15 at 16 (Ex. O).)

Davis's lost profits estimates are not based upon mere speculation or unsupported methods that would make her findings inadmissible at trial. Her report covers the Panduit factors set forth above in making her calculations. (See Doc. No. 262-14 at 24-40 (Ex. N).) Moreover, the fact that some of her findings relied upon the third-party DeciBio report in determining 10x's market share percentage for single cell analysis does not render her opinion unreliable and inadmissible. Rather, whether an expert "relied on the best data in forming his opinions is a question for the jury." Allscripts Healthcare, LLC v. Andor Health, LLC, No. CV 21-704-MAK, 2022 WL 3021560, at *15 (D. Del. July 29, 2022).

Additionally, the DeciBio report was not the only data Davis relies upon in making the determination that 10x occupied approximately 75% of the market share. For example, she cites the testimony of John Walsh, Defendant's Vice President of Marketing, who stated that 10x's market share was anywhere from 75% to 90%. (Doc. No. 262-14 at 32-33.) Defendant's CEO, Alexander Rosenberg, even testified that it was more than 80%. (Id.) Although Defendant points out that Dr. Durruthy testified that he believed this figure was not reliable, this testimony is not a

basis on which to exclude expert testimony altogether. Rather, Defendant will have the opportunity to cross-examine Davis and present countervailing evidence as to what it believes is the appropriate percentage.

Similarly, Defendant avers that Davis's report is unreliable because her estimate of Defendant's customer base is speculative and again relies upon her discussions with Dr. Durruthy without providing further information. (Doc. No. 260 at 31-34.) In this regard, because she relies upon findings of Plaintiffs' fact witness, Dr. Durruthy, Davis's opinions are not necessarily unreliable. As Plaintiffs noted, Dr. Durruthy's testimony covered his personal knowledge of the demographics of 10x customers and how they relate to Defendant's customer base, matters he covers as Plaintiffs' Director of Product Management. (Doc. No. 271 at 34.) Davis then used Dr. Durruthy's findings in connections with 10x's sales data to calculate lost profits. (See Doc. No. 262-14 at 37 n.166.) So long as there is a rational connection between the data and the opinion, an expert's reliance on this information renders the opinion admissible. But it also remains an issue to be addressed during cross-examination. Apotex, Inc. v. Cephalon, Inc., 321 F.R.D. 220, 233 (E.D. Pa. 2017). Again, Defendant will have the opportunity to cross-examine damages expert Julie Davis, fact witness Dr. Durruthy, and to present their own countervailing evidence on this point at trial.

Defendant has yet another challenge to Davis's testimony on lost profit. Defendant further objects to Davis's report because she relies on Dr. Quackenbush's technical report, which Defendant claims is inappropriate because Davis does not have the expertise to analyze such a report. (Doc. No. 260 at 28.) This issue has already been addressed by a court in this District, where it held that it was not inappropriate for Davis to rely on an expert report prepared by Dr. Quackenbush, as this is a "matter of weight, not admissibility." See 10X Genomics, Inc. v. Vizgen,

Inc., No. 22-CV-595-MFK, 2025 WL 26734, at *10 (D. Del. Jan. 3, 2025) (citing Apple Inc. v. Motorola, Inc., 757 F.3d 1286, 1321 (Fed. Cir. 2014) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field.")).

In this case, Defendant argues that Davis and Dr. Quackenbush could not identify the 10x products that Defendant's customers would have purchased if its products were not available. (Doc. No. 260 at 29.)  But Plaintiffs maintain, for example, that Davis relies upon Dr. Quackenbush's findings that 10x's Chromium kits are acceptable substitutes for Defendant's allegedly infringing Evercode kits.  (Doc. No. 271 at 41.)  As such, a factual dispute exists, and Defendant will have the opportunity to cross-examine Davis and Dr. Quackenbush on this matter and to offer its own testimony in rebuttal.

For these reasons, there is no basis to exclude Davis's testimony or report regarding lost profits.

### B.    Price Erosion

Next, Defendant argues that Davis's price erosion analysis is also unreliable and for this reason her testimony is inadmissible.  (Doc. No. 260 at 29.)  The Court disagrees because, once again, there is sufficient information in the record to permit her to testify on price erosion.

Like lost profits, to establish price erosion, a patentee has the burden of showing that "but for" the infringement, its product would have been sold at a higher price.  Dorman Prods., Inc. v. Paccar, Inc., 201 F. Supp. 3d 663, 690 (E.D. Pa. 2016), as amended (Oct. 17, 2016).  "A credible but-for analysis must account for the 'effect of [a] higher price on demand for the product.'" SynQor, Inc. v. Artesyn Techs., Inc., 709 F.3d 1365, 1381 (Fed. Cir. 2013) (quoting Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1357 (Fed. Cir. 2001).

Defendant argues that Davis's price erosion analysis is unreliable for several reasons.  First, it maintains that she does not reliably account for other products in the market besides Defendant's

products.  (Doc. No. 260 at 35-36.)  In this regard, Davis's conclusion that 50% of Defendant's customers would have purchased 10x products if Defendant's products were unavailable is unreliable because the DeciBio report states only 10% of the market was held by other competitors, and of that 10%, Defendant only held 3-4% of the market share.  (Id.)  Therefore, Davis's original conclusion that 30% to 40% of the market share of competing products belonging to Defendant was unreliable.  Despite this unreliability, she inflates the percentage and concludes that "at least half of the price erosion related to 10x's inability to increase pricing is due to Parse."  (Id. (quoting Doc. No. 263-14 at 40 (Ex. N)).)

Plaintiffs counter that Defendant's arguments go to the weight and credibility of Davis's testimony, not to its admissibility.  (Doc. No. 271 at 36-37.)  They state that Defendant does not dispute that Defendant's market share percentage along with 10x's other competitors was 30% to 40%.  (Id. at 37.)  Further, they refer to evidence in Davis's report that Defendant's impact on 10x's sales was closer to 60% to 83%, and therefore Davis's 50% estimate was conservative.  (Id.)  They note that Davis states in her report as follows:

> I have considered the delta between the typical increase of 5.5% and the agreed upon increase for 2024 by SKU.  I have then considered that there are other competitors in the market that may contribute to 10x's decision to not increase its prices at the same historical rates.  I have seen evidence from 10x related to 2024 lost sales that compare the impact from Parse in relation to the other competitors and placed Parse's impact in the range of 60% to 83%.  I have also considered the 2023 DeciBio report that estimates the market shares of 10x at approximately 75%, academic/open-source at approximately 15%, and other competitors at less than 10%.  I have also considered the deposition testimony of Parse witnesses that estimates Parse's market share to be around 3% to 4%.

(Doc. No. 262-14 at 44-45.)  Based on the above factors collectively, Davis calculates Defendant's responsibility for 10x's price erosion to be approximately 50%.  (Id.)  Thus, sufficient evidence has been presented to show that Davis's calculations came from identifiable sources that an expert

witness could rely on.  Thus, in determining the admissibility of her testimony on price erosion, her methodologies were not based only on speculation or guesswork.

Second, regarding the alleged discounts and giveaways 10x gave to its customers in order to "starve off competition from Parse," Defendant contends that Davis did not account for the budgetary restraints of 10x's customers and blames Defendant for every discount and giveaway given by 10x.  (Id. at 37.)  Additionally, 10x's internal Salesforce database included entries where 10x gave away instruments to its customers for free.  Davis blames this situation on Defendant, but Defendant maintains it never sold instrument products.  (Id.)  It also maintains that Davis admitted that she did not understand the Salesforce data and failed to account for discounts or giveaways given to 10x's customers or to corroborate the cause of such discounts or giveaways. (Id. at 38.)

Plaintiffs, however, maintain that Davis permissibly relies on the 10x Salesforce database to evaluate discounts as well as on Dr. Durruthy, who confirmed each discount was given in response to Defendant's activity in the market.  (Id.)  As such, Davis testified at her deposition as follows:

> A:    I have gone through every single one that was remaining in our analysis and discussed them with Dr. Durruthy and dropped a few others because he was familiar enough with the account to recognize that maybe there was another reason that might have related to the discount and he didn't want to describe it as being only related to Parse.
>
> Q:    So there's been another discussion with Dr. Durruthy?
>
> A:    Yes. We went through every single line item on this document that is marked Exhibit 12 to this deposition that's part of Schedule 2 to Appendix E.
>
> Q:    You went through every single entry in updated Appendix E, Schedule 2?
>
> A:    Every single one.

(Doc. No. 262-17 at 208-209 (Ex. Q).)

18

Plaintiffs also maintain that customers who could not afford 10x's budget pricing were taken out of consideration in the calculation of price erosion. Further, while Defendant argues that Davis did not understand 10x's internal sales database, the testimony provided suggests that she reviewed the data with Dr. Durruthy to confirm that the discounts given were in direct response to the need to compete with Defendant. Thus, as noted above, it was not improper for Davis to rely on Dr. Durruthy's statements in supporting her conclusions. Moreover, in her supplemental report, Davis reduces her calculation of price erosion in part based on Dr. Hoffman's expert report. (See Doc. No. 262-15 at 18-20; Doc. No. 262-16.) Again, Defendants will have the opportunity to counter Davis's findings and conclusions at trial and to cross-examine her about this matter.

Therefore, the Court finds no basis to exclude Davis's report or testimony regarding her analysis on price erosion.

## C.    Reasonable Royalties

Lastly, Defendant seeks to exclude Davis's testimony and report based on her determination of reasonable royalties for the Brenner and Giresi patents. (Doc. No. 260 at 38.) In her report, Davis compares several licensing agreements in making her ultimate decision on reasonable royalties.[9]    (See Doc. No. 262-14 at 50-70.)    She ultimately concludes that the

---

[9]    Davis reviewed several licensing agreements when making her royalty calculation for the Giresi and Brenner patents. These include:

- Stanford / Epinomics Exclusive (Equity) Agreement and Amendments
- 10x / Population Genetics Technologies Ltd. ("PGT") Intellectual Property Purchase and License Agreement and Intellectual Property Assignment Agreement
- 10x / REquest Genomics LLC ("Request") License Agreement
- 10x / BD Settlement and Patent Cross License Agreement
- 10x / Bio-Rad Settlement and Patent Cross License Agreement
- 10x / Bio-Rad ATAC-Seq Patent Sublicense Agreement
- SplitBio / UW Exclusive Option Agreement for SPLiT-seq Single Cell RNA Sequencing
- SplitBio / UW Exclusive Start-Up License Agreement for SPLiT-seq Single Cell RNA Sequencing

10x/REquest Genomics LLC ("REquest") agreement was the appropriate one to use to calculate royalties for the Brenner patents, and the Stanford/Epinomics Agreement was the appropriate one to use to calculate royalties for the Giresi patents.  (See Doc. No. 262-14 at 50-70.)

"The reasonable royalty theory of damages . . . seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing."  AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1334 (Fed. Cir. 2015); see also Cal. Inst. of Tech. v. Broadcom Ltd., 25 F.4th 976, 994 (Fed. Cir. 2022) (". . . a reasonable royalty is what a willing licensor and a willing licensee would have agreed to at a hypothetical negotiation just before infringement began.")  "And when a party chooses to use a hypothetical-negotiation framework, while mathematical precision is not required, some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed."  In re Cal. Expanded Metal Prods. Co., No. 2023-1140, 2024 WL 1190943, at *3 (Fed. Cir. Mar. 20, 2024) (internal citations omitted).

In determining the reasonably royalty, an expert may use prior existing agreements so long as the license is "proven comparable to the license that is the subject of the hypothetical negotiation upon which the expert's proposed reasonable royalty rate is based."  Cytiva Sweden AB v. Bio-Rad Lab'ys, Inc., No. CV 18-1899-CFC, 2021 WL 9525213, at *1 (D. Del. June 1, 2021). "Comparisons of past patent licenses to the infringement must account for the technological and economic differences between them."  Wordtech Sys., Inc. v. Integrated Networks Sols., Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010) (internal citations omitted).  Courts have held that so long as the expert's analysis "exceeds loose, vague allegations of comparability, the degree of comparability

---

(See Doc. No. 262-14 at 50-71.)

of license agreements is usually a factual issue best addressed by cross examination and not by exclusion of an expert." Moskowitz Fam. LLC v. Globus Med., Inc., No. CV 20-3271, 2023 WL 5487662, at *6 (E.D. Pa. Aug. 24, 2023).

Here, a review of Davis's report shows that the REquest and Stanford licenses for the Brenner and Giresi patents respectively are comparable for meeting the Daubert threshold for the hypothetical licenses that would have resulted from negotiations between Plaintiffs and Defendant. In fact, a court in this district recently denied a defendant's motion to exclude Davis's testimony on reliability grounds:

> After valuing the respective patent families, Davis uses a comparability analysis to determine how the hypothetical negotiation would arrive at a royalty rate for each asserted patent. [Defendant] challenges Davis's method as being unreliable, but again, this is a point appropriately addressed via cross[-]examination and presentation of contrary evidence, not exclusion. Accordingly, the Court denies [Defendant]'s motion to exclude Davis's testimony.

10X Genomics, Inc., 2025 WL 26734, at *10.

Davis's royalties calculations for each set of patents are discussed below.

### i.    Brenner Patents' Royalty Calculation

Regarding the Brenner patents, Defendant argues that Davis relied "solely on a license between 10x and REquest [Genomics LLC] whereby REquest agreed to [pay] a 12% royalty on net sales of products practicing the Giresi Patents." (Doc. No. 260 at 38.)  It argues that she ignored the actual license for the Brenner patents, which was an arm's length negotiation agreement between 10x and Population Genetics Technologies Ltd. ("PGT").  (Id. at 38-39.)

Davis's report found that the "hypothetical negotiation would have resulted in a license with payment structured as a running royalty based on net sales of the Brenner Accused Products." (Doc. No. 262-14 at 48.)  Based on these findings, she concludes that the PGT agreement was not comparable for several reasons.  First, it did not set an established royalty.  (Id. at 57.)  Second, the

21

agreement was entered into prior to the issuance of the earliest Brenner patent.  (Id. at 58.)  Specifically, PGT and 10x entered into the agreement on October 21, 2015.  (Id.)  The '981 patent, the earliest Brenner patent, was issued on December 18, 2018.  (Id.; Doc. No. 1-1 at 2.)  Third, at the time 10x and PGT entered into their agreement, there was no established single-cell product covered by the Brenner patents.  (Id.)  Fourth, at the time the Brenner patents were established, PGT was no longer a product manufacturing company.  (Id.)  Fifth, Davis maintains that the single-cell analysis industry had grown significantly from 2015 to the time of her hypothetical negotiation start date, 2021.  (Id.)  Therefore, while "actual licenses to the patent-in-suit are highly probative to the proper amount and form a reasonable royalty," Davis has sufficiently shown why the PGT license is not technologically and economically comparable to the hypothetical negotiation for the Brenner patents.  See Moskowitz Fam. LLC v. Globus Med., Inc., No. CV 20-3271, 2023 WL 5487662, at *5 (E.D. Pa. Aug. 24, 2023).

Instead, Davis used for comparison the agreement between 10x and REquest Genomics LLC.  (Doc. No. 262-14 at 59.)  She describes this agreement as "R[E]quest's desire to obtain a sublicense for the purposes of development and commercialization of services for performing ATAC-seq in plant samples."  (Id. (internal citations omitted).)  Although this agreement was related to the Giresi patents, she relies on Dr. Quackenbush's finding that the Giresi and Brenner patents are technologically comparable, as the ATAC-seq protocols are part of 10x's Chromium platform.  (Id.)  Further, she notes that at the time the agreement was entered, the products in the Brenner patents "were well known and 10x was the clear leader in a growing industry."  (Id. at 60.)  Based on these findings, while Defendant's belief that the PGT license is better suited to determine the royalties for licensing the use of the Brenner patents, her testimony is reliable and

admissible, and her opinions are best suited to be vetted through cross-examination and/or a rebuttal witness.

Therefore, the Court does not find Davis's report unreliable as to her reasonable royalty calculation for the Brenner patents.

### ii.    Giresi Patents' Royalty Calculation

As to the Giresi patents, Davis utilizes an exclusive equity agreement between Stanford and Epinomics to calculate the reasonable royalties.  (Doc. No. 262-14 at 50.)  In 2018, 10x acquired Epinomics.  (Id. at 52.)  The original agreement was transferred to 10x, and additional amendments were made to the license maintenance fees.  (Id.)  Under the agreement, 10x pays a royalty and annual maintenance fee for the exclusive license relating to ATAC-seq.   The maintenance fees are broken down as follows:

- $50,000 in 2019
- $100,000 in 2020
- $200,000 in 2021
- $300,000 in 2022, and on each subsequent October 15th until the expiration or termination of this Agreement.

(Id. at 53.)  Davis concludes that based upon Defendant's alleged infringement of the Giresi patents from November 2021 to the end of 2023, Defendant is responsible to pay a lump-sum of $800,000, calculated as follows:  $200,000 for 2021, $300,000 for 2022, and $300,000 for 2023.  (Doc. No. 260 at 39.)

Defendant's disagreement with Davis's use of the Stanford agreement as the basis for the hypothetical negotiation on the royalty that should have been paid for the Giresi patents is a factual dispute, not a disagreement based on the methodology used to come to her conclusions.  In her report, Davis concludes that the Stanford agreement is economically comparable because it gave 10x a sublicense for research purposes, "which is consistent with the primary purpose of the

hypothetical license for the Giresi Patents." (Doc. No. 262-14 at 55.) She further submits that the agreement's maintenance fees serve as proper benchmark to determine the Defendant's annual lump-sum payments for its infringing research. (Id.) Additionally, Defendant's damages expert, Dr. Ivan Hofmann, agreed that the Stanford agreement was economically comparable for use in the parties' hypothetical negotiation of the Giresi patents. (See Doc. No. 273-24 at 96, ¶ 264 (Ex. 27) ("The parties would have considered the Stanford License Agreement whereby a lump sum annual maintenance fee was agreed upon for the Giresi Patents, for the period prior to the commercialization of products that practice the Giresi Patents.").) But the experts ultimately disagree on which years the maintenance fees should be paid and the amount of the lump sum royalty payment.

Therefore, the comparability of licenses in determining what a reasonable royalty should be for the Brenner and Giresi patents is a factual dispute that is best left for a jury to decide. Defendant will have an opportunity to cross-examine Plaintiffs' damages expert on her methodologies and to present the testimony of their damages expert to counter the calculation of reasonable royalties.

## V.    CONCLUSION

For the reasons stated above, Plaintiffs' damages expert, Julie Davis, has met the reliability requirement under the Daubert standard. Therefore, Defendant's Daubert Motion to Exclude Plaintiffs' Expert Testimony (Doc. No. 259, 260) will be denied. An appropriate Order follows.